**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| | : | |
| **LOCAL 1159 OF COUNSEL 4** | : | |
| **AFSCME, AFL-CIO** | : | **No. 3:19-cv-00555 (VLB)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF BRIDGEPORT** | : | |
| **Defendant.** | : | **January 28, 2020** |

**RULING ON MOTION FOR PRELIMINARY INJUNCTION [Dkt. 15]**

Before the Court is a Motion for Preliminary Injunction under Federal Rule of Civil Procedure 65. [Dkt. 15 (Mot. for Prelim. Inj.), Dkt. 1 (Compl.)] Plaintiff Local 1159 of Counsel 4 AFSCME, AFL-CIO ("Local 1159") moves to temporarily restrain and enjoin the City of Bridgeport (the "City") from ordering eleven of Local 1159's member officers to appear before the Board of Police Commissioners for discipline prior to adjudication of this case on the merits. [Dkt. 15 at 1, Dkt. 32 (Mem. Supp. Prelim. Inj.)]. The City opposes the motion. [Dkt. 19 (Obj. to Prelim. Inj.), Dkt. 30 (Mem. Opp. Prelim. Inj.)]. The parties have filed a stipulation of facts. [Dkts. 24 (Joint Stip. of Facts and Exs.), 26 (Ex. B to Joint Stip. of Facts)]. On January 16, 2020, the City filed a Notice of Re-Institution of Disciplinary Hearings, [Dkt. 36], to which Local 1159 objected, [Dkt. 37], to which the City responded. [Dkt. 38]. For the following reasons, the Court DENIES the Motion for a Preliminary Injunction and OVERRULES Local 1159's Objection.

I.      <u>Introduction</u>

The dispute concerns whether Bridgeport Police Department ("BPD") police officers not specifically named or alluded to in an original citizen complaint, or who are alleged or proven to have committed trivial offenses, are subject to discipline under the *Barros* Decree ("*Barros* Decree" or "Decree"), a consent decree requiring the Board of Police Commissioners to hear all cases of misconduct alleged by citizens against BPD officers. [Dkt. 1 at 1]; *see Barros v. Walsh*, No. B-492 (D. Conn. 1973), *modified*, (D. Conn. 1985). Local 1159 argues that the *Barros* Decree does not apply to such police officers, and they should instead be subject to the discipline procedures outlined in its collective bargaining agreement. [Dkt. 1 at at ¶32]. The City argues that the *Barros* Decree by its terms does apply to such officers. [Dkt. 30 at 10-19].

## II.     Factual Background

The following facts are taken from the Complaint [Dkt. 1] and the Joint Stipulation of Facts [Dkt. 24], as well as their exhibits. These exhibits include the *Barros* Decree [Dkt. 24-8], the Mendez Complaint [Dkt. 24-3], the Diaz Complaint [Dkt. 24-4] and the Report of the Office of Internal Affairs [Dkts. 24-2 and 26].

### A.  The Parties

The City is a duly authorized and existing Connecticut municipal corporation and a "municipal employer" within the meaning of Connecticut General Statutes § 7-467(1). [Dkt. 24 ¶1]. Local 1159 is the exclusive representative and bargaining agent for the bargaining unit consisting of all uniformed and investigatory employees employed by the City of Bridgeport in the

BPD (including Police Officers, Detectives, Sergeants, Lieutenants, Captains and Deputy chiefs, but excluding the Chief of Police, the Assistant Chief, and the Deputy Chiefs). *Id.* at ¶¶3-5. Local 1159 is the exclusive, legally recognized bargaining representative for the following BPD officers who have been charged with disciplinary violations in connection with the Colorado Avenue incident and resulting citizen complaints described below: (1) Joseph Cruz; (2) Kenneth Fortes; (3) Douglas Bepko; (4) Todd Sherbeck; (5) Joseph Pires; (6) Matthew Johnson; (7) Linet Castillo-Jiminez; (8) Natalie McLaughlin; (9) Michael Mazzaco; (10) Adam Szeps; (11) Stephen Silva. Dkt. 24 ¶ 6].

### B. The Colorado Avenue Incident

On October 21, 2017, at approximately 10:20 p.m., BPD Officer Natalie McLaughlin was dispatched to the area of State Street and Colorado Avenue to investigate a noise complaint. *Id.* at ¶ 7. She discovered a party with loud music in the backyard of 316 Colorado Avenue, and Officer Bobby Hernandez arrived to assist her. *Id.* Additional officers responded to assist them. *Id.* at ¶8. As the scene reportedly grew more chaotic, one of the officers called a "10-32" (officer needs assistance). *Id.* at ¶9. All available BPD officers responded to the call, resulting in approximately forty-six officers at the scene. *Id.* at ¶ 10. BPD officers arrested eight people, including Carlos Mendez and Peter Diaz. *Id.* at ¶ 11.

### C. Civilian Complaints & Investigation

Two days later, on October 23, Carmelo Mendez filed a subscribed and sworn Citizen Complaint with the BPD Office of Internal Affairs ("BPD OIA")

regarding the events of October 21, along with a two-page handwritten narrative. [Dkt. 24 at ¶ 12.] The written narrative frequently references Mendez's video recording of the events described. [Dkt. 24-3]. Mendez specifically alleges:

- A police officer hit Mendez's mother and threw her to the floor.

- Civilians were arrested for no reason.

- An officer with a mohawk threw Mendez on the floor, simply because he was recording.

- Once Mendez was on the floor, ten officers kicked Mendez and punched him in the face.

- Two officers with "shiny objects" hit him in his face, making circle marks. When Mendez was in handcuffs, the officer with the mohawk hit him with the same object.

- The officer with Mendez's (legally permitted) gun told Mendez he would not get his gun back, and that he was an "asshole, stupid idiot that was not compl[ying] with their orders." After Mendez informed the officer that Mendez was a military veteran, the officer said, "Shut the fuck up, and I don't give a fuck who you are."

- When Mendez entered the holding cell, his face was bleeding, and his right side was bleeding.

- When Mendez was in the holding cell, he saw an officer punch his friend in the face, knocking the friend to the ground at around 11:40 pm.

- Mendez passed out in the holding cell and fell.

[Dkt. 24-3].

The next day, on October 24, 2017, Peter Diaz filed a subscribed and sworn Citizen Complaint with the BPD OIA, also regarding the events of October 21. [Dkt. 24 at ¶ 13]. His complaint specifically alleges that in Booking, at around 11:30 p.m., an officer punched him in the face, knocking him to the ground. [Dkt. 24-4]. An officer also kicked Diaz in the leg, reinjuring it, and creating a situation

where it possibly needed surgery. [Dkt. 24-4].

The same day, Bridgeport Police Chief Armando J. Perez wrote to Lieutenant Brian Dickerson in the BPD OIA, directing him as follows:

> [O]pen an internal investigation concerning the possible use of excessive force and any other department violations stemming from the incident on Colorado Avenue this past weekend and the subsequent actions in the booking area. The investigation's initial specific focus are the actions of Sergeant Paul Scillia and officer T. Lattanzio.

[Dkt. 26 at Record #1].

The BPD OIA investigation began immediately. The BPD OIA conducted the first of 56 taped interviews with witnesses that day. *See generally* [Dkt. 26]. Interviews continued through May of 2018. *Ibid.* On November 13, 2018, the BPD OIA issued a 404-page report detailing the investigation, the findings, and recommended charges against police department personnel associated with the Colorado Avenue incident. *Ibid.* Disciplinary charges were brought against 17 BPD police officers and two BPD detention officers. [Dkt. 24 at ¶ 15].

### D. Represented Officers and Charges

Local 1159 argues that the *Barros* Decree does not apply to eleven of the charged officers for whom it is the bargaining representative. These officers and their disciplinary charges[1] are listed below:

---

[1] The Court uses the BPD OIA's "Issues" categories to characterize the disciplinary charges, rather than the specific Bridgeport Police Department Policies, Procedures, Rules, and Regulations violated.

1. Officer Joseph Cruz is charged with Excessive Force based on his arrest of Ramon Davila. Dkt. 26-2 at 2. He is also charged with "Truthfulness" based on his sworn statement to the BPD OIA. *Id.* at 5.

2. Detective Kenneth Fortes is charged with Truthfulness in his incident report and during his BPD OIA interview. *Id.* at 15. He is also charged with Inaccurate Reporting for submitting his "necessary use of force" form three days late. *Id.* at 21.

3. Officer Douglas Beko is charged with Truthfulness in his sworn statement to BPD OIA. *Id.* at 33.

4. Officer Todd Sherback is charged with saying "fuck you" to Morales while placing him under arrest, and for failing to report accurately to the BPD OIA. *Id.* at 35-36.

5. Officer Joseph Pires is charged with Truthfulness for inaccurately stating in his incident report that he had to move quickly out of the way of a vehicle to avoid being struck. *Id.* at 38. He is also charged with Reporting for submitting the "use of the force" form five days late. *Id.* at 43.

6. Officer Matthew Johnson is charged with Reporting for submitting two inconsistent reports regarding Deida Mendez. *Id.* at 46.

7. Officer Linet Castillo-Jimenez is charged with Truthfulness in her incident report and during her BPD OIA interview. *Id.* at 51.

8. Officer Natalie McLaughlin is charged with Truthfulness and Reporting in her incident report and sworn statement to the BPD OIA. *Id.* at 155.

9. Officer Michael Mazzaco is charged with a Racial Slur for his language on October 21. *Id.* at 62

10. Officer Adam Szeps is charged with Failure to Provide Medical Attention to Mendez on October 21. *Id.* at 11. He is also charged with Truthfulness in his incident report and during his BPD OIA interview, as well as Reporting. *Id.* at 8.

11. Officer Stephen Silvia is charged with Failure to Render Medical Attention to Mendez on October 21. *Id.* at 63.

The Bridgeport Board of Police Commissioners began the officer due process hearings in the Colorado Avenue matter on May 8, 2019. [Dkt. 2 at ¶ 33].

### E. Collective Bargaining Agreement

The City and Local 1159 have a Collective Bargaining Agreement. [Dkt. 24-1 (Ex. A, Collective Bargaining Agreement)].[2] CBA Article 11, "Disciplinary Action," establishes a "just cause" standard for discipline; addresses procedures to be followed by the City during the disciplinary process and grants other specified rights to Local 1159 and its member officers. [Dkt. 24 at ¶ 36 (citing 24-1, Ex. A, CBA at Article 11)].

CBA Article 11, Section 7 grants Local 1159 and any adversely affected officer the right to contest discipline imposed by the City. It states:

> "[i]f an officer is disciplined under Sections 2 or 3 and the employee and Union feel that action was without just cause, the Union may, no later than ten (10) days after receipt by the Union of the written decision, submit said dispute to arbitration before the Connecticut Board of Mediation and Arbitration for discipline other than terminations or the American Arbitration Association for involving termination discipline. The arbitrator shall hear the dispute and render a decision that shall be final and binding. The arbitrator shall have the power to uphold the action of the City or rescind or modify such action, and such power shall include, but shall not be limited to the right to reinstate a suspended or discharged officer employee with full back pay. The City shall pay all costs of the arbitrator and the American Arbitration Association."

[Dkt. 24 at ¶ 38 (quoting Dkt. 24-1, CBA Article 11.7)].

---

[2] The Collective Bargaining Agreement states that it is effective between July 1, 2012 to June 30, 2016, so that it would have expired before the Colorado Avenue incident. [Dkt. 24-1 at 2]. However, given that the parties stipulated to its existence and effectiveness, the Court will assume that it is effective.

CBA Article 10, Section 7, acknowledges that court rulings and statutes shall have precedence over any conflicting provision of Article 10, the Officer Bill of Rights. Section 10.7 provides:

> Despite any other provisions hereof, rulings of the Supreme Court of the United States, or the Second Circuit of the Federal Court or the Connecticut Supreme Court or the United States Supreme Court, or any statute relating to any matter dealt with herein shall govern actions which otherwise would be conducted as set forth above.

[CBA Article 10.7].

### F. The Barros Decree

#### i. Procedural history of the Barros Decree

On April 4, 1972, a group of citizens filed a civil action in the United States District Court of Connecticut against the City of Bridgeport's Superintendent of Police, Mayor, Police Commissioners and others alleging that defendants engaged in "a pattern of conduct consisting of violence, intimidation and humiliation in denial of rights, privileges and immunities guaranteed to plaintiffs and members of their class by the Constitution of the United States." [Dkt. 24-5 at ¶1 (Ex. E to Joint Stip. of Facts: Compl., *Raphael Barros, et al. v. Joseph Walsh et al.* U.S.D.C. Civil Action B 482 (D. Conn. Apr. 4, 1972)].

They complained about "official indifference to their demands for redress of grievances," and alleged that their complaints to the BPD "have either not been acted upon or have been acted upon in such a cursory manner, as to deny… any adequate remedy." *Id.* at ¶¶ 1, 16. They alleged that then-Police Superintendent Walsh "caused many such [citizen] complaints not to be placed in the personnel

8

file fo the Bridgeport Police Department but rather in his own 'personal' file, where no action has been taken with respect to them." *Id.* at ¶ 16. As a further example of official indifference, the plaintiffs alleged that a Bridgeport resident "went to the Bridgeport Police Department headquarters to make a complaint and was refused the right to do so." *Id.* at ¶17.

Among other incidents, the plaintiffs claimed that, on May 20, 1971, in response to "certain incidents of civil disorder… in the area of East Main Street in Bridgeport" "numerous" "members of the Bridgeport Police Department… engaged in a systematic pattern of conduct, consisting of a large number of individual acts of violence, intimidation, and humiliation," including punching plaintiffs, kicking plaintiffs, and beating plaintiffs with rifles, kicking clubs and rifles. [Dkt. 24-5 at ¶¶ 31-33, 39-40, 46-47, 71-72].

Eighteen months later, on December 20, 1973, the parties reached a "Settlement Stipulation" approved by the Court and entered as a Consent Decree on December 21, 1973. [Dkt 24-6 (Ex. F to Joint Stip. of Facts: Settlement Stipulation, *Barros*, U.S.D.C. Civil Action B 482)]. At the hearing where the Court approved the settlement stipulation, plaintiffs' counsel commented that "a lot of credit is due… to the pressures that were placed upon the City of Bridgeport and the Bridgeport Police Department through the law suit," and that they expected the decree to "substantially contribute to resolving a lot of difficult problems that have arisen in the past." [Dkt. 24-7 (12/21/75 Settlement Approvla Hr'g Tr.) at 4:11-19, 9:13-25].

On September 24, 1984 the United States District Court appointed a special master "to attempt to resolve the differences of the parties" with respect to modifying the *Barros* Decree following a decade of experience under the decree and various organizational changes in the BPD. [Dkt. 34-6 (Ex. H to Joint Stip. of Facts: "Recom. of the Special Master and Order," *Barros,* U.S.D.C. Civil Action B 482) at 1]. On May 6, 1985 the District Court acted on the recommendations of the Special Master. *Ibid.* The Court affirmed Parts I, II and IV of the Settlement Stipulation of December 20, 1973 and amended Part III of the Settlement Stipulation as reflected in Exhibit A to its Order. *Id.* at 3. The Court's May 6, 1985 Order defines the *Barros* Decree civilian complaint procedure employed by the BPD from May 6, 1985 through the present.

From at least December 21, 1973 through the present, "all penalties and/or forfeitures as a result of sustained findings" on civilian complaints have been made by the Bridgeport Board of Police Commissioners. [Dkt. 24 at ¶ 32]. While the duties and powers of the Bridgeport Board of Police Commissioners have been revised in the intervening years, the Bridgeport City Charter still provides that "[t]he Board of Police Commissioners shall be responsible for:… [s]uch other duties as may be assigned to it by law, this charter, the ordinances of the City of Bridgeport, collective bargaining agreements and *court orders.*" [*Id.* at ¶¶ 22-31] (emphasis added) (citing Ex. I, 1986 Bridgeport Charter, Chapter 17 §§ 230, 238; and Ex. J, 2019 Bridgeport Charter, Chapter 13).

The Decree notes that it "shall not be subject to modification by the collective bargaining agreement." *Barros* Decree at § 1.

### i. *Conduct to which* the Barros *Decree applies*

The *Barros* Decree provides that its procedures "shall be used for all complaints which allege improper conduct, including but not limited to the following areas:"

a. Excessive force and physical brutality,
b. The entering and searching of homes without warrants or legal excuse,
c. The false or illegal arresting without probable cause or warrant,
d. The illegal detaining or imprisoning without probable cause or legal excuse,
e. The refusal to provide proper medical attention,
f. The failure or refusal to give or provide proper police protection from criminal acts to the public
g. The abuse, harassment, or intimidation of citizens because of race, creed or sex, religion or national origin.

[Dkt. 1. ¶3], *Barros* Decree § I . The Decree further provides that the "Citizen Complaint Form" (CC-1) shall be used in all cases where a citizen desires to make a formal complaint in reference to police conduct or police services." *Barros* Decree § 2; *see also id.* at § 4 ("All complaints received, whether written or oral, in person or on telephone, shall be referred to or accepted by the platoon captain or the senior patrol officer on duty. This officer shall advise the complainant that he or she must complete a Citizen Complaint form.")

### ii. *Overview of* Barros *Decree procedures and penalties*

After a citizen submits a CC-1 form, the BPD OIA will determine whether to reject the complaint as untimely, to initiate its own investigation, or to assign the investigation to the division to which the officer was assigned. *Barros* Decree §

VII. "The [BPD OIA] will… notify the officers under investigation of the investigation by memorandum with a copy of the CC-1 attached. This notification shall be designated Form CC-2." *Id.* at § VIII.

"During the investigation, investigators will take sworn statements from all witness[es] as well as from the concerned officer(s)." *Id.* at § XII. "In investigations the subject officers will be given copies of the complaint's statement or interview prior to his/her statement or interview." *Ibid.*

If the investigation reveals evidence sufficient to sustain the allegations, the investigation will be referred to the Board of Police Commissioners. *Id.* at § XIII. In this case, reports will be forwarded to "officer(s) who the findings involve." *Id.* at § XIV(2)(b). "All penalties and/or forfeitures as a result of sustained findings will be by the Honorable Board of Police Commissioners." *Id.* at § XVI. "In all cases of suspension or disciplinary hearings, procedures outlined in the Procedure Order B-66 shall be complied with." *Id.* at § XV.

iii.    *Applicability of the* Barros *Decree to officers to whom the complaint does not refer*

The Decree provides that, when the citizen complaint form is filed, the senior patrol officer accepting the form shall "inform the complainant of the identity of the Police Officers complained about if the information is reasonably available or that the Office of Internal Affairs will notify him or her as to the names of the Police Officers involved within thirty days and upon completion of the investigation." *Id.* at § VI.

The Barros Decree provides that "the Office of Internal Affairs will, when possible, within thirty (30) days of receipt of the complaint notify all complainants as to the identify of any officer(s) involved in the incident if the identity of the officer(s) is unknown to the complainant." *Barros Decree*, Section VIII; *see also* § XIII (a complaint will not go to the board if "the incident occurred, but was lawfully proper….").

The Barros Decree also expressly covers "complaints which allege… the refusal to provide proper medical attention." *Id.* at § 1. § VIII.

    *iv.   Applicability of the* Barros *Decree to lack of truthfulness and false reporting during a Citizen Complaint investigation*

With regards to reporting and witness statements taken after citizen-reported misconduct, the *Barros* Decree states:

> During the course of the investigative process, investigators will take sworn statements from all witnesses as well as from the concerned officer(s). This will be accomplished by taking a tape recorded transcribed statement. The transcript will be reviewed by the person giving it, after which an affidavit will be executed as to the truth of the contents of the same. Every person shall, after affidavit execution, be given a copy of his/her own statement. In investigations the subject officer(s) will be given copies of the complainant's CC-1 with the names of the witnesses other than the complainant obliterated, prior to his/her statement or interview. Any person giving a statement or interview may have a representative present during such statement or interview.

*Id.* at § XII. The Decree goes on to provide:

> Complainants, witnesses and officers shall be held fully accountable for the truth of their sworn statements; however, no complainant,

13

**witness, or officer shall be held accountable for their unrecorded testimony in executive session unless such testimony is in violation of Department Rules and Regulations.**

*Id.* at § XV. This language dates from the original 1973 *Barros* Settlement stipulation. [Dkt. 24-6 (Ex. F: 12/20/1973 Settlement Stipulation) at § 3.C][3].

### III.     Standing and Jurisdiction

Local 1159 has organizational standing in this case since (a) its members have standing; (b) the interests at stake are relevant to Local 1159's purpose, as proven by its collective bargaining agreement; and (c) neither the claim nor the declaratory relief requested requires individualized proof. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

The Court has subject matter jurisdiction under 28 U.S.C. §1331 as it is asked to interpret its own consent decree.

### IV.     Standard for Preliminary Injunctions

Interim injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Grand River Enterprise Six Nations Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). "A plaintiff seeking a preliminary injunction must

_____

[3] The *Barros* Decree provides that, during disciplinary hearings, "Procedure shall be followed by Board members as indicated in the opinion of the City Attorney's Office, dated March 31, 1971 and the decision of Judge George Saden in the case of Goldstein v. O'Connor, et al. dated April 9, 1973. In all cases of suspension or disciplinary hearings, procedures outlined in the Procedure Order B-66 shall be complied with." § XV. Plaintiffs did not provide the Court with these materials, which are not publicly available, and so the Court did not consider them.

demonstrate… [1] that they have some likelihood of success on the merits and [2] will suffer irreparable harm absent an injunction, [and] [3] also that the "the balance of equities tips in his favor and [4] an injunction is in the public interest." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 112 n.4 (2d Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[4]

On this motion for preliminary injunction, Local 1159 seeks prohibitory injunctive relief, rather than mandatory injunctive relief – that is, it seeks to "maintain the status quo pending resolution of the case" rather than "alter it." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,* 883 F.3d 32, 37 (2d Cir. 2018). "[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, *i.e.,* the situation that existed between the parties immediately prior to the events that precipitated the dispute." *Asa v. Pictometry Intern. Corp.*, 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010). *See also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (preliminary

---

[4] The *Otoe-Missouria* court drew no distinction between this and the traditional Second Circuit test for when a district court may grant preliminary injunction: "[D]istrict courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)).

injunctive relief intended to preserve the status quo until the court can rule on lawsuit's merits).

"The district court has wide discretion in determining whether to grant preliminary injunctive relief." *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). Allegations of irreparable harm or claims of a likelihood of success on the merits must be substantiated with "evidence in admissible form." *See Girard v. Hickey*, No. 9:15-CV-0187, 2016 WL 915253, at *7 (N.D.N.Y. Mar. 4, 2016) (citing *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction.") and *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals.")).

V.  <u>Analysis</u>

A.  *Irreparable Harm*

"Plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc*, 555 U.S. 7, 22 (2008); *Faiveley Transp. Malmo AB* v. *Wabtec Corp*, 559 F.3d 110, 119 (2d Cir. 2009) ("A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction"), *quoted in Blatt v. City of New York*, No 19CV1227, 2019 WL 1367605, at *2 (S.D.N.Y. Mar. 26, 2019). "Irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales v. Labatt Brewing*

*Co.*, 339 F. 3d 101, 113 (2d Cir. 2003); *see Blatt*, No. 19CV1227, at 2 (same). A plaintiff must demonstrate that his injury is "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118; *Blatt* at * 2.

Here, the Court finds that there is no showing of irreparable harm.

First, the Bridgeport Board of Police Commissioners has not made a decision as to the discipline that any of the officers will receive, so it is speculative, not actual or certain, that they will suffer any kind of loss at all.

Second, even if the officers were ultimately terminated, "the law is clear that a discharge from employment and the injuries that may flow therefrom (*e.g.* lost income, damage to reputation, and difficulty finding future employment) do not constitute the irreparable harm necessary to obtain a preliminary injunction" because reinstatement and money damages make whole any loss suffered. *Peck v. Montefiore Medical Center*, 987 F. Supp. 2d 405, 412 (S.D.N.Y. 2013) (citing *Sampson v. Murray*, 415 U.S. 61, 89-92 (1974) and collecting Second Circuit cases). More specifically, the Southern District of New York recently held that an inability to accrue time in grade as a lieutenant pending disciplinary charges does not constitute irreparable harm because any losses can be remedied through monetary damages and court orders following trial. *Blatt v. New York City*, 19CV1227, 2019 WL 1367605, at *2 (S.D.N.Y. Mar. 26, 2019). In this case, if the officers in question are disciplined, but Local 1159 ultimately prevails on its claims, the officers have the right under their collective bargaining agreement to

seek reversal of the discipline, full back pay, and any appropriate make whole relief before a neutral arbitrator. [Dkt. 24-1 at Article 11.7].

Third, the Court is not persuaded that denying this preliminary injunction will deny the affected police officers their constitutional due process rights to a hearing under *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). [Dkt. 32 at 11]. It is true that the officers in question have a reasonable expectation of employment because they can only be terminated for "just cause" under their collective bargaining agreement, and they have a right to a hearing—that is, notice and the opportunity to respond—before termination. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-543 (1985) (establishing that public employees who can only be terminated for cause have a constitutional due process right to a hearing). However, the *Barros* Decree does provide for hearings for officers facing suspension or termination hearings, Decree at § XV, and the parties stipulate to due process hearings occurring in this matter, [Dkt. 24 at ¶ 33]. While "due process is flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), Local 1159 provides no precedent in support of its contention that this situation specifically demands hearings pursuant to its collective bargaining agreement.

Finally, the Court is not persuaded by Local 1159's bare allegation that the affected police officers will be irreparably harmed by ongoing media attention. [Dkt. 32 at 12]. This conclusion lacks any factual support, and the court may not resort to or base its decision in speculation.

18

Therefore, Local 1159 has failed to establish the irreparable harm that is required for it to obtain a preliminary injunction.

## B.      Serious Questions Going to the Merits

To obtain a preliminary injunction, a party must show either "(1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Because the *Barros* Decree is not pursuant to any democratic statutory or regulatory scheme, the Court applies the less rigorous "fair ground for litigation" standard. *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (holding that the district court should apply the more rigorous "likelihood" standard where the "moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme" because "democratic processes are entitled to a higher degree of deference"), *quoted by Citigroup*, 598 F.3d at 35 n.4.

"Consent decrees… are agreements between parties to litigation that should be construed basically as contracts." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 998 F.2d 1101, 1106 (2d Cir. 1993) (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975)) (interpreting a consent decree between the United States and a national union which established an independent review board to hear disciplinary actions); *see United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001). "The scope of a consent decree must be discerned within its four

corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Int'l Bhd. of Teamsters*, 998 F.2d at 1101 (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)); *see Perez v. Danbury Hosp.,* 347 F.3d 419, 424 (2d Cir. 2003) ("[C]ourts must abide by the express terms of a consent decree and may not impose additional requirements or supplementary obligations on the parties even to fulfill the purposes of the decree more effectively."). But "a court also may consider, as it would in construing a contract, normal aids to construction such as the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *Int'l Bhd. of Teamsters*, 998 F.2d at 1101 (quoting *ITT Cont'l Baking Co.*, 420 U.S. at 238).

There are two separate points of interpretation of the *Barros* Decree on which Local 1159 and the City disagree. First: whether the *Barros* Decree applies to officers who are not "specifically named or referred to" in the Citizen's Complaint. [Dkt. 1 at Count I]. Second: whether the *Barros* Decree applies to "trivial" officer misconduct in addition to "serious" misconduct. *E.g.* [Dkt. I at Count II].

### i. Officers Who Are Not Specifically Named or Referred To

Local 1159 argues that the plain language of the *Barros* Decree conveys that it does not apply to any police officer not named or referred to in a citizen complaint. [Dkt. 1 at ¶¶ 25- 33 (citing *Barros* Decree at §§ I, II, VI)]. The City

responds that in fact the *Barros* Decree contemplates that citizen complainants may not be able to identify the offending officers when they file a complaint. [Dkt. 31 at 17].

First, both parties agree that the *Barros* Decree applies to officers who were not named in the complaint if they were described in the citizen complaint, as the Decree has numerous provisions relating to informing the complainant "of the identity of Police Officers complained about." *Barros* Decree at §§ VI, VIII; *see* [Dkt. 1 at ¶30, Dkt. 30 at 17].

Next, the Court agrees with Local 1159 that there must be *some* connection between the citizen complaint and an officer for the *Barros* Decree to apply. As Local 1159 compellingly argues, "if the Decree were meant to control all discipline of officers—without any need for a connection to a citizen complaint—there would be no need for the existing language in the collective bargaining agreement concerning discipline." [Dkt. 1 at ¶¶31-32 (citing Dkt. 26-1 at Article 11)]. The question then is how explicitly complainants must refer to an unnamed officer for the *Barros* decree to apply to them. More relevantly for this case, does the *Barros* Decree apply when (a) a citizen complainant does not specifically describe an individual officer, but the officer was involved in the broader incident complained of; or (b) the alleged misconduct did not occur during the incident itself, but instead occurred during the *investigation* of the complaint?

The Court is persuaded that the *Barros* Decree applies in both cases. First, the *Barros* Decree applies to an officer even when a citizen complainant could not

describe the officer individually if the officer was involved in the broader incident of which the plaintiff complaints.

Section VIII of the *Barros* Decree provides in part that, "the [BPD] OIA will, when possible… notify all complainants as to the identity of officer(s) involved in *the incident* if the identity of the officers is unknown to the complainant." (emphasis added). Thus, the *Barros* Decree provides for the investigation of an *event*, as opposed to the actions of a single officer, recognizing that a citizen may not know exactly how many police officers were present or could not describe each individual police officer. *See also* Decree § XIII (the BPD OIA may find "the incident occurred, but was lawfully proper…"). This interpretation is consistent with the circumstances which gave rise to *Barros* Decree, which included an alleged incident in which plaintiffs claimed that "numerous" "members of the Bridgeport Police Department… engaged in a systematic pattern of conduct, consisting of a large number of individual acts of violence, intimidation, and humiliation," including punching plaintiffs, kicking plaintiffs, and beating plaintiffs with rifles, kicking clubs and rifles.  [Dkt. 24-5 at ¶¶ 31-33, 39-40, 46-47, 71-72].

As to the second case, the *Barros* Decree states:

> During the course of the investigative process, investigators will take sworn statements from all witnesses as well as from the concerned officer(s). This will be accomplished by taking a tape0recorded transcribed statement. The transcript will be reviewed by the person giving it, after which an affidavit will be executed as to the truth of the contents of the same. Every person shall, after affidavit execution, be given a copy of his/her own statement. In investigations the subject officer(s) will be given copies of the

complainant's CC-1 with the names of the witnesses other than the complainant obliterated, prior to his/her statement or interview. Any person giving a statement or interview may have a representative present during such statement or interview.

*Barros* Decree § XII. The Decree goes on to provide:

Complainants, witnesses and officers shall be held fully accountable for the truth of their sworn statements; however, no complainant, witness, or officer shall be held accountable for their unrecorded testimony in executive session unless such testimony is in violation of Department Rules and Regulations.

*Id.* at § XV. The language of this section dates from the original 1973 *Barros* Settlement Decree, which was much shorter. [Dkt. 24-6 at § III.C]. Therefore, the *Barros* decree contemplates that witness officers may commit post-citizen-complaint truthfulness and reporting misconduct during the investigation, and also contemplates sanctions for such misconduct. In the next section, the Decree provides:

All penalties and/or forfeitures as a result of sustained findings will be by the Honorable Board of Police Commissioners.

*Id.* at § XVI. In that section, "sustained findings" refers to an investigation in which there is sufficient evidence to prove the citizen complaint allegation. *See Barros* Decree §XIII. If findings are sustained, "copies of the investigation will be forwarded to… the President of the Board of Police Commissioners," copies which presumably include officer statements and reports, as well as the investigating officer's evaluations of those statements and reports. *Id.* at § XIV.

The *Barros* Decree does not define what it means to "be held fully accountable," or, more pertinently, who determines the consequences when someone is held accountable. To answer this question, the Court looks to the circumstances surrounding the formation of the consent decree. In the original 1972 *Barros* complaint, the plaintiffs complained about "official indifference to their demands for redress of grievances." Complaint at ¶1, *Barros et al.* v. *Walsh et al.*, U.S.D.C. Civil Action B. 482 (D. Conn. Apr. 6, 1972). The plaintiffs alleged that their complaints with the Bridgeport Police Department "have either not been acted upon or have been acted upon in such a cursory manner, as to deny… any adequate remedy." *Id.* at ¶16. They alleged that BPD sometimes refused to record their complaints, *id.* at ¶17, and, when their complaints were recorded, the records were systematically buried. *Id.* at ¶16. In their statement requesting approval of the original 1973 *Barros* Decree, plaintiffs' counsel commented that they expected the decree to "substantially contribute to resolving a lot of difficult problems that have arisen in the past." [Dkt. 24-7 (12/21/75 Settlement Approval Hr'g Tr.) at 4:11-19, 9:13-25]. These circumstances underline that the drafters of the *Barros* Decree intended it to ensure that investigations of citizen complaints are independent and probing.

The *Barros* Decree was entered into for the express purpose of piercing the so-called blue wall of silence, blue code or blue shield, the practices historically used by police officers to shield one another from the ramifications of their errors, misconduct, or crimes. *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 104

(2d Cir. 2000) (defining "blue wall of silence"). The parties intended that misconduct designed to conceal conduct under investigation would come within its ambit. Such authority is akin to court's jurisdiction to adjudicate misconduct in the course of trial preparation through its contempt powers and the Federal Rule of Civil Procedure 11.

Therefore, the Court finds that, by its plain language and circumstances surrounding the formation of the consent order, the *Barros* Decree applies to officers who are not individually named or described in a citizen complaint, if they were involved in the incident that the complainant complains about or if they committed procedural misconduct during the investigation of citizen complaint in a manner which could reasonably be expected to have the effect of subverting the investigation of the complaint and the vindication of the complainant's rights. While the scope of the *Barros* Decree is limited—it does not apply to disciplining officers for misconduct identified only by other officers—it does encompass these situations. The Court finds that Local 1159 has not shown a sufficiently serious question going to the merits to make them a fair ground for litigation.

### ii. Trivial Misconduct

Local 1159 alleges that the *Barros* Decree processes do not apply to trivial misconduct, and only applies to "serious misconduct of Bridgeport police officers which directly impinges on citizens rights". [Dkt. 1 at Count II, at ¶5]. The City argues that the *Barros* Decree applies to all types of misconduct complained of in citizen complaints. [Dkt. 30 at 9-15].

The Court finds that the *Barros* Decree applies to all types of misconduct. The *Barros* Decree states that its procedures, including the referral of sustained findings to the Board of Police Commissioners, apply uniformly to all types of citizen complaints in numerous sections:

- "The procedures provided herein shall be used for complaints which allege improper conduct…" *Id.* at § I.

- "The Citizen Complaint Form shall be used in all cases where a citizen desires to make a formal complaint in reference to police conduct or police services." *Id.* at § II.

- "All complaints… shall be referred to or accepted by the senior patrol officer." *Id.* at § IV.

- "All penalties and/or forfeitures as a result of sustained findings [of the truth of a complaint's allegations] will be by the Honorable Board of Police Commissioners…." *Id.* at § XVI.

The *Barros* Decree applies to discipline arising out of citizen complaints – and the incidents about which citizens complain may involve "trivial" issues. As the City points out, there is no place in the *Barros* Decree which makes distinctions between citizen complaints based on the severity of the alleged misconduct. *See generally* Barros *Decree.*

Further, while the *Barros* Decree enumerates certain misconduct, the Decree makes clear that the enumerated list is not limiting, exclusive, or exhaustive, *id.* at § 7 ("including but not limited to"), unlike other enumerated lists in the Decree, *e.g. id.* at § XIII ("The results of any investigation conducted will be as follows…").The Decree does not limit the Board of Police Commissioners' jurisdiction to the enumerated conduct or state that the board's jurisdiction is

limited to conduct similar to that enumerated. **Instead, it expressly states that the board has authority to adjudicate misconduct "not limited to" that which it expressly enumerates. Also, the Court is not persuaded that every enumerated example is "serious" in the sense meant by Plaintiffs– for instance, the Decree lists "the refusal to provide proper medical attention" without limit, apparently encompassing even a complaint that an officer did not provide a band-aid to a child with a skinned knee.**

**Therefore, the Court holds that, based on its plain language, the *Barros* Decree applies to all types of misconduct complained of in citizen complaints, regardless of the alleged severity. Thus, the Court finds that Local 1159 has not shown a sufficiently serious question going to the merits to make them a fair ground for litigation.**

### C. Public Interest & Balance of the Equities[5]

**A preliminary injunction is "in the public interest" if the preliminary injunction would not "cause harm to the public interest." *U.S. S.E.C. v. Citigroup Global Mkts. Inc.*, 673 F. 3d 158, 163 n.1 (2d Cir. 2012). Local 1159 alleges that such an injunction is in the public interest for three reasons: First, since the Barros Decree is a "tool for citizens," "the citizens have a vested interest in its correct interpretation." [Dkt. 32 at 15]. Second, BPD officers have a Due Process right to a "fair and unbiased investigation and disciplinary process." *Ibid* (citing**

---

[5] **The Court follows the parties in analyzing these two factors together. [Dkt. 30 at 28]; [Dkt. 32 at 14].**

*Ms. L. v. U.S Immigration & Customs Enf't ("ICE"),* 310 F. Supp. 3d 1133 (S.D. Cal. 2018), *modified,* 330 F.R.D. 284 (S.D. Cal. 2019)). And, third, "any loss of confidence is not good for the morale of the officers" and their recruitment and retention. *Ibid.* The City responds that an injunction would harm the public interest because it potentially requires the City to continue to employ incompetent police officers, and that the costs of continuing to apply the *Barros* Decree are minimal because the *Barros* Decree process is an "orderly and deliberative adjudicative process," promulgated by the district court and followed by the parties for decade. [Dkt. 30 at 29 (citing *Peck v. Montefiore Med. Ctr.,* 987 F. Supp. 2d 405, 414-15 (S.D.N.Y. 2013)]. Local 1159 responds to the City and argues that a temporary injunction would not cause hardship for the City because the City has already spent a year and a half on the investigation, and the eleven officers are currently working full duty without restrictions. [Dkt. 32 at 17].

The Court finds that the public interest is better served by denying the motion. First, while the Court acknowledges that citizens have an interest in implementing the correct interpretation of the *Barros* Decree, as discussed in the previous merits section, Local 1159 has not shown that this interest is best served by granting the motion for a preliminary injunction. Next, while the Court acknowledges that the public interest is served by a preliminary injunction when "Defendant's policy violates the U.S. Constitution" or likely does so, Local 1159 has not shown that the City's application of its interpretation of the *Barros* Decree likely violates the U.S. Constitution, as discussed in Section IV.A on irreparable

harm. Further, the Court finds that an injunction is not necessary to promote officer morale, as the *Barros* Decree process has been followed by the parties for decades without ill effect.

Ultimately, the question is whether a preliminary injunction would "cause harm" to the public interest. The Court is persuaded that potentially requiring the City to continue to employ incompetent police officers does harm the public interest as it may diminish the public's confidence in its police force. Therefore, the Court finds that a preliminary injunction is not in the public interest in this case.

### VI.    Conclusion

As the Court finds that there is no irreparable harm in the absence of a preliminary injunction, no serious questions going to the merits, and possible harm to the public interest from a preliminary injunction, the Court DENIES Local 1159's motion for a preliminary injunction [Dkt. 15] and OVERRULES Local 1159's objection [Dkt. 37].

SO ORDERED at Hartford, Connecticut, this  28th day of January 2020.


_____/s/_____
Vanessa L. Bryant
United States District Judge